The next case for today is 2019-40906, United States of America v. Eli Lilly & Co. et al. You may proceed, Mr. Starr. May it please the Court. This case brings before the Court an important issue of statutory interpretation, namely the meaning of a pivotal word, hearing, as set forth in Section 3730C2A of the False Claims Act Amendments of 1986. The issue arises in the context of two key TAM actions brought to enforce a vitally important statute passed by Congress to foster integrity in the commercial marketplace, the Anti-Kickback Statute. Our submission this morning is threefold, and very briefly. First, as a matter of statutory interpretation, the word hearing should be construed consistently with its ordinary meaning. Second, a hearing we submit would demonstrate that the government has acted inconsistently with the will of Congress, and that it has, in effect, sought to bring about a pro-tanto repeal of the Anti-Kickback Statute. Third, under the totality of the circumstances here, the government has conducted itself arbitrarily and capriciously. To turn to our first point, as the Court has seen, the Courts of Appeals are in some disarray on the question of the meaning of the pivotal term, hearing, as used in this context. In the Swift case, the D.C. Circuit suggested that a hearing is simply a way to provide the key TAM relator with an opportunity to persuade the government to change its mind. But that cannot be right. The Swift interpretation is, first of all, inconsistent with ordinary meaning, and it needlessly triggers fundamental questions about— Mr. Starr, didn't you all have a hearing? I mean, you all appeared in front of a judge and argued, so that sounds to me like a hearing. It was. What did you ask to do at the hearing and were not allowed to do? It was not an evidentiary hearing, and we offered to put on a very pivotal witness, John Menino, and I went early on, in light of the policy concerns that have been articulated—and by the way, the government does not maintain that we had an evidentiary hearing as required by procedural due process. The way the case unfolded was the filing of a motion to dismiss and the original papers of that motion to dismiss, and I want to hold up the declaration. This is a two-page declaration, two pages to support the original motion to dismiss. Four paragraphs went to the structure and methodology of NHCA in this process, conducting witness interviews. We were prepared to address all that, but what transpired was essentially an oral argument that I think demonstrated two things. First, that the Swift standard, as I was suggesting, should not be followed, but secondly, that based upon the papers that the district court had before it and the dramatic turnabout of the government, which had in its moving papers castigated and criticized NHCA, did suddenly and about face an open court and said, we love NHCA. There was no need for an evidentiary hearing at that stage. I just want to be sure that, you know, respectfully, I didn't memorize every page of the record, so I did look at it, but I want to be sure I look at what you're talking about. Can you give me the record site for where you all requested to do something at the hearing and the judge said you can't? I do not have that record site. I'll try to get it for rebuttal. I know what happened at the oral argument. I said Mr. Menino is here, but Judge Haynes, I want to make a very fundamental point here. The whole structure and thrust of what was happening in the district court was let's have an argument on these papers, especially the government's position that it enjoyed unfettered discretion. If the government enjoys unfettered discretion, there is no evidentiary hearing. We had to fight that off. And then as we left the hearing, after the government had walked back from its attack on NHCA, it was wrong about that, after it had walked back on other aspects of its challenge, my view was we have prevailed. The judge will conclude that there was, in fact, arbitrariness and caprice in the government's conduct. We also want in an evidentiary hearing and we think due process, procedural due process. By the way, the government has not argued waiver and I think it would be quite wrong and unprofessional of the government to say they waived any right to an evidentiary hearing. We have a right as a matter of procedural due process, but we also think, you're honest, we have it under the statute and the grant of a hearing and in light of district court practice across the country. District court practice across the country as affirmed by at least two circuit courts says we need an evidentiary hearing. This is Goldberg v. Kelly. This is this court's decision 1984 in Thibodeau. You get to confront your witnesses. At a minimum, your honors, we should be able to confront the three government declarants in this case. And this does not. I want to quickly move to the issue of separation of powers and the policy concerns that the government. You do that. This is a complicated case and we'll make sure that everyone has an apple time. But before you do that, it's so that is it your position that the magistrate judge was aware that you were going under arbitrary and capricious under your view of the law and that you wish to have evidence presented or cross-examine the fiance, the declarators. Is that correct? The answer is yes. We offered we had John Menino from the Philadelphia area in court. We offered to put him on. But we felt, Judge Elrod, that we had totally rebutted the government's very thin set of with the Menino declaration. The minute there was no reason, I guess, for the magistrate judge to say, I think we need to call for Mr. Menino because we devastated the government's case, if I may say so. That's not over argument. In fact, what was so traumatic was for the United States attorney to stand up and very graciously said, we love Mr. Menino. That's in the record. We love Mr. Menino. We want him to file more cases. OK, I have two more quick questions. I'm sorry. The other one is in the district court, it was you you argued those same points that it was you needed an evidentiary hearing and that it was abuse of discretion or arbitrary and capricious. Correct. We said it's arbitrary and capricious. We said we are prepared to prove our case. But we felt honestly, Judge Elrod, there was no point for an evidentiary hearing because the government's affidavits and declarations had been thoroughly rebutted. But now that we are where we are, we would like an evidentiary hearing to show that on the. I just want to be clear. I'm sorry. No, I just want to be clear. Did you ask for an evidentiary hearing and the judge refused it? Or are you now saying that's what you should get? Because I think those are two different things. You have said two different things to us already, which is you asked for an evidentiary hearing and didn't get it, but also that you didn't need one because you had so carefully refuted everything via affidavits. So which one? If I may want to be very precise, we asked we represented to the court that we have John Menino here in court prepared to testify. The magistrate judge did not respond at all. That was our submission. And why was that our submission? Because the fundamental thrust of the motion to dismiss was NHCA is bad and NHCA, which is wrong. And we've demonstrated that, I think. And I don't think the government will respond to that or cavil with that. And the second thing that we said is the anti-kickback statute is so vitally important. And the challenge that was mounted in the motion to dismiss to our methodology with respect to interviewing witnesses is wrong. And the magistrate judge did not respond to that. And so, Judge Elrod, if I may just complete this, I want to refer the court to page 23 of our reply brief. And in particular, that entire page, which goes to these questions that I think we're going to hear a lot of policy concerns, we address the policy concerns of the government that valuable sources, services to patients were not going to be provided under our theory, the anti-kickback statute. I'm hoping that we won't hear a lot about policy concerns because that's above the court's pay grade. That's for different branches. We're just here to see what Congress say and what is what is so I don't think you need to. Right now, we're just trying to get the procedural posture of the case. So what was the district court informed that there was a belief that they had to be arbitrary and capricious based upon the arguments that were made and the thorough rebutting of the declarations? There's no question. I'm sorry. No. So the district court was informed and was informed also that if the district court wasn't persuaded by that, that they needed an evidentiary hearing at that point. So you could rebut. I think that was implicit, but I want to be very clear with the court. We did not say to the court in open court, we need an evidentiary hearing. But please don't suggest that that in any way contemplates or suggest waiver. The government hasn't argued it. And if that is the case, then the government has waived a waiver argument. But it shouldn't. It should not be the case. So is it your position that we actually could go we could have had the swift standard? You don't want the swift standard or we could have the sequoia standard. And we we would we don't have any precedent in this circuit that binds us in this area and that there is already a circuit split. So we get to choose that we're going to join. Is that correct? That is correct. I would add that I think that there is a great opportunity that would be helpful to the administration of justice for this court to actually harmonize. I think that the chasm is not as deep as meets the eye, because when one goes to Judge Randolph's opinion, one sees that after this provocative statement about the purpose of the hearing is to convince the government to change its mind. Judge Randolph goes on to say that Ms. Swift, the relator in that case, has not come forward with evidence that what the government did was arbitrary, capricious, lawless or tainted by fraud. Our submission today is the government, with all respect, is behaving lawlessly here. And this is the point of the policy issue that I do have to make. Judge Elrod, the government is saying relators are here with a policy set of objections. We are not objecting to governmental policy as interpreted by HHS. They are wrong. And if there's any doubt about that, after reading page 23 of our of our brief, which really isn't contradicted, these are not policy concerns we're articulating. We're talking about the statute, the anti-kickback statute, and it's emphatically the province of the judicial department to say what the law is. There's no. Let me ask you this. We know that the magistrate judge did do an assuming arguendo ruling that if this higher standard applied, you still lose. So on appeal, don't you have to show that as a matter of law, you prevail? Because if there is any fact finding, any discretion involved, then you would lose on that. I disagree with what you've just said. With all respect, it is, we believe, the law that under the totality of the circumstances, the government, if it has acted arbitrarily and capriciously, and we've identified in the brief a number of ways in which the government has acted, in this case, arbitrarily and capriciously. The long delay. Here are the two opinions by the magistrate judge on the merits of the 12B6. All this extraordinary months long effort in the Article 3 branch went with the government remaining silent when their policy and their own procedure requires them to come forward, requires them to come forward and not waste the resources of the judicial department, quite apart from the relator's resources. But we also just want to come back to first principles. Under the Constitution of the United States, as interpreted by the Supreme Court in the Stevens case, we have a protectable property interest, which the government is simply trying to annihilate for reasons that we believe are completely arbitrary and capricious, including expenditure of government resources. We've rebutted that. We believe they vastly inflated. The resource allocation issue. But all these things can be, as your sibling circuits have done, is that let's sort it out in a genuine evidentiary hearing. We have not had that. And we invoke it here. If I may, I would just ask if you could on rebuttal, if you could point me to where in your blue brief you argue that the you requested an evidentiary hearing and it was made John Menino available. That is exactly what you because you're saying they waived the waiver and all that. I'm not saying you necessarily waived anything. I'm just wanting to focus in the blue brief on where you made the point that you requested an evidentiary hearing and were denied that in the district court. Very good. I think I would ask that each side would get two more minutes each side, because I don't know that we've heard why it's arbitrary and capricious yet. Well, thank you. Well, first is the very long delay in the government's action. And it's unexplained delay in filing the motion to dismiss all through that long summer. Indeed, through the spring of twenty eighteen, the issues were being joined, were being litigated, an almost daylong hearing on the 12B6 motion to dismiss the government. Of course, it had its opportunity to determine whether to intervene. It remained on the sidelines for almost a year before it then came in after these reports and recommendations, 125 pages and all 225 pages, plus the district court's opinion affirming that my point is this, the Justice Department, we lay all this out in our briefs and the government does not have a response or at least an effective response. Why did you allow the Article three branch? And we argued this in the district court. They sat too long. They violated the Granston memo that cited in our brief. They violated the Justice Department manual that's cited in our brief. And your honor, that is a form of arbitrary and capricious activity. It is also quite arbitrary and capricious that the government and we'll probably hear this today, continues to misunderstand our fundamental position under the anti kickback statute that is both lawless and it's arbitrary and capricious. I mentioned the argument with respect to the expenditure of government resources. When the court reviews the record, you will see these are glittering generalities. Moreover, if I may just make this quick point, the estimate is vastly inflated, suggesting that there will be X number of depositions, the X number that the government says we're fearful of all this burden and so forth is inflated because it was based on an old discovery order. And then my final point, cost benefit analysis, we hear about the cost, but the government has departed from its traditional practice of engaging in a benefits analysis. And Judge Randolph and Swift noted there's going to be a very small recovery here. The government is saying, even if Ms. Swift is correct, the recovery is six thousand dollars. Here, the potential recovery is hundreds of millions of dollars. And the government just says, well, we don't think the case has merit, which brings us back to their interpretation. We're going to wrap it up, Mr. Starr. Thank you very much. You save time for rebuttal. Mr. Scarborough, you may proceed with your argument. Thank you, Your Honor. May it please the court, Charles Scarborough for the United States. Although the False Claims Act allows key TAM relators to pursue civil fraud claims on behalf of the United States, it also gives the government broad power to limit and control such claims, including plenary authority in Section 3730 C2A to dismiss such actions, quote, notwithstanding the objections of the relators. As this court recognized in Riley, this, quote, unilateral power to dismiss is an important component of the control the government retains in exercising its responsibilities under Article two to ensure that the federal law is faithfully executed and enforced. And as this court further explained in Searcy, the government's exercise of control mechanisms such as its absolute power to veto settlements is unfettered and not subject to judicial review. Counselor, do you agree that, Counselor, do you agree that there is a circuit split as to what standard is to be applied and the Fifth Circuit is not weighed in on that yet? I do agree that there is a circuit split and I do agree that the Fifth Circuit has not technically held what the standard is for a motion to dismiss. What I'm trying to suggest with this opening is that Riley and Searcy show that this court has already endorsed the key principles underlying the D.C. Circuit's approach in Swift. And we think that this court should now join the D.C. Circuit in holding that the government has unfettered discretion to dismiss key actions brought in its name. But I want to what do you what do you make of the argument that even though that they use the term unfettered discretion, they then later analyze the issue using a cost benefit analysis and use the term arbitrary and capricious in that very same opinion. So maybe there is may not be such a split as as it's been reported to be. Well, I don't agree with that characterization of Swift at all. And Swift doesn't stand alone. Swift has been reaffirmed by the East Circuit in a number of cases in the Hoyt case, most recently in the Snyder case, which the Supreme Court recently denied cert in. Swift is an unfettered discretion standard. I believe with the language in that case about capricious and how do you what do you do with that? So the language I believe that Mr. Starr was referring to comes in the second part of the opinion after declaring that the standard is unfettered discretion. The court at page 254 of Swift says even if Sequoia set the proper standard, the government easily satisfied. And that's the place where essentially it says, look, even if we were to apply Sequoia, we would think the government has met that standard. You know, it's an alternative holding. Yes, your honor. I believe that's the case. And I believe, you know, subsequent D.C. Circuit decisions make it quite clear that the D.C. Circuit doesn't engage in any sort of review under the Sequoia Orange Standard standard. Keep in mind, do you need us to adopt Swift in order for you to prevail here today, sir? No, your honor. That's a very important point that that was my very next sentence. I want to emphasize that we don't actually think there's a great deal of difference in the standards when Sequoia Orange is properly applied. And we don't think the two standards are outcome determinative here. Both are deferential. And the government certainly identified rational reasons related to legitimate government interest for seeking to dismiss these key TAM actions. However, we do think that this court has gone a long way in decisions like Riley and Searcy to endorsing the plenary control that the government asserts over key TAM actions, including the power to dismiss. And I'd like to start focusing on statutory construction. Mr. Starr began his presentation. OK, and he he he talked about hearing. And I do want to understand this notion that you didn't have a hearing because it sure looked like a hearing to me. Did he ever make the claim in the district court that he wanted to put on certain evidence that was refused or the judge didn't allow that? I don't believe so, your honor. I've you know, I've read that hearing transcript a number of times. I think the closest they came was saying Mr. Menino is here and he's available. That's not a request for an evidence. You're hearing. But I think the important thing to remember is that the hearing was sort of a two part thing similar to this argument. It was both, you know, an argument about whether the government's actions were rational. And it was also an argument about what legal standard applies here. And so I think it's important if you're going to say I was deprived of the right to put on Mr. Menino, but you never asked to put him on. You just said you could. I don't understand how that can be an error. Regardless, I quite agree, your honor. And, you know, Mr. Starr seemed to be implying that we waived some sort of argument. I don't we didn't waive anything because we weren't there was nothing to respond to that. We didn't argue to us that there was a hearing that there that I don't know that you said there was a hearing. And you argued to us that there doesn't need to be any sort of robust hearing. Did you argue to us that there was indeed a hearing? We've argued both points, your honor. I mean, again, that we we're we're our primary position is that the court should adopt swift and that that gives broad authority that doesn't have any substantive limits on the on the government to just dismiss. It doesn't supply a standard of review. And so that seems to be a really difficult thing to say that you don't really have the right to a robust hearing when Congress has specifically said that you get a hearing and the hearing can't just be for you to have the chance to explain to the one side, to the to the government. And it can't just be because you want to press conference because none of those are a proper Article three function. Well, what we know is the statute doesn't say anything about evidentiary hearing. At most, the statute says an opportunity for a hearing. And we think their argument, basically their entire statutory construction argument is centered around the canon that you shouldn't construe terms to be surplusage. That's basically something that waves you off a certain construction that would otherwise be reasonable. And you need a hearing. You need a hearing. And whether or not that's evidentiary or not should be determined by the facts and circumstances of the case before you. Why isn't that the case? Well, again, the I know, but my point is where there's both a legal argument and a factual argument as to whether you got a hearing. And as I just, I just want to say the the the appellants said they had a hearing in their blue brief. They said after relators filed a response. The magistrate judge held a hearing. And then after the hearing and during the hearing. Nobody's denying there was a hearing. There wasn't anything for you to say they waived or argued to the contrary, because they said there was a hearing. It was only in the reply brief. And now that they're basically saying they didn't have a hearing. They clearly had a hearing. They just didn't like the way it went, I guess. But they didn't ask for anything. They didn't get other than the win. I couldn't agree more, Your Honor. But I want to what I want to focus on is that our primary statutory construction argument here is that Section 3730 C2A gives the government plenary authority to dismiss notwithstanding the objections of the related. It does not supply a standard. Okay. Are you trying to argue that they that you that the hearing is not of any consequence? That's what you keep returning to the release. You're trying to get an opinion out of the court that has a really strict, swift standard. And we're just trying to decide the case. And that's why we're having kind of we're not. We're having some difficulty. So I'm asking, do you need us to say that you don't get an evidentiary hearing or that make any determination about what the purpose of this hearing is in this case? Look, we arguably was some sort of hearing. What? You know, help again. I want to be clear. This court could take the same approach as the Third Circuit recently did in Chang and not decide between the two standards, not take a position and affirm on the Sequoia Orange standard, basically affirm on the rational basis. And that is certainly an option open to this court. What I'm trying to suggest is that this court's decisions suggest that the swift standard is the more applicable standard. And in particular, I would like to point to the court. It's unbunked decision in Riley, in which the court emphasized the mechanisms of control that the government exercises over key actions and found that to be a critical component or critical reason why the government was not unconstitutionally. The statute didn't unconstitutionally delegate authority to key Tamra leaders. That's a really important point. But are you saying the swift standard says that you can't get an evidentiary hearing or that there's no proper room for a robust hearing under swift? Yes, Your Honor. I'm saying that under swift, the swift endorses an unfettered discretion standard. Yes, Your Honor. To get there. An unfettered discretion means there's really not a hearing of any consequence. Is that correct? That's correct, Your Honor. And what do you do with invidious discrimination under this standard? Well, Your Honor. And what do you do with the language that we've got congressional language against that and we've got you sort of said, well, in certain cases, that may not be the case. I want to know if you stand by that. I think, again, when you're talking about something like invidious discrimination or fraud on the court under the swift standard, the D.C. Circuit left open and the government conceded in that case, the possibility that if you were engaged in something, if there was evidence that you were engaged in something like fraud on the court, which this court is defined to mean something like bribing a judge or it's a very discreet cabin concept or some sort of really credible claim of invidious discrimination. Yes, you could have a hearing swift allows for that. And I think this court recognized that hearing if the evidence is undisputably that it would cost one dollar to proceed with the case and it would recover one billion dollars hypothetically. And yet the government wants to dismiss the swift stand for the proposition that the I believe it largely does, Your Honor. And again, that in the hypothetical that you you sort of toss out there, it's difficult to imagine that. But I know I can't fight hypotheticals, but the government has lots and lots of other things. It sits in a unique position that the Supreme Court has recognized in Hecker versus Cheney in affirming basically unreviewable enforcement discretion in this area. So this is not I'm sorry. So I think you think that you still could. Thank you for answering hypothetical. But then what do you do with the statutory language? Why did Congress say hearing if your position is that you don't really get a hearing unless it's invidious or fraud? Why did Congress? How how can we read out that, which is what I think you just said we should do? Well, I think that it gives meaning to the term hearing to allow for that safety valve for a court to adjudicate a claim of fraud on the court. That's enough to avoid application of the surpluses. Can it give the statute some meaning? I only do it in emergency situations. It anticipates that there will be a hearing in the run of the mill case. I don't actually don't agree with that characterization around the statutory language. Actually, we've been talking a lot about the right to a hearing. The statutory language is actually much more qualified. It says the government may dismiss notwithstanding the objection to the relator, provided the person or provided the court has provided the person with an opportunity for a hearing. That suggests that upon a particular showing and a particular request, you might be able to get a hearing. But I want to return to the idea that the backdrop here is prosecutorial non-enforcement discretion. Heckler versus Cheney and other cases, including in this court, recognize that this is a quintessential executive branch type of decision about whether to go forward with a prosecution and enforcement action in the United States names to remedy injuries to the United States. It is our claim. We are the repeat player in the system. We are the ones who are going to be litigating anti-kickback statute claims in other cases. There are lots of considerations that are not easy to monetize or to explain in a hearing that go into the government's determination whether to dismiss a particular case. Counselor, let me, if I could, ask you a couple of questions, sir. Do you maintain that, given the history of this case, that you could simply pick up the phone and call and say, we're dismissing this case without any court intervention? I mean, the court's going to have to pass on it, correct? And you're going to file a motion with the district court. Are you under no obligation, in your view, to offer a justification for dismissing the case, given the huge amount of investment that's already been made, given the fact that you have been supportive of litigation? I did that earlier. Okay. In other words, given the fact of this thing, why isn't the government obligated to demonstrate that they, for whatever reason, that they do justification for the dismissal? In other words, a unilateral unfettered right means, here's a motion to dismiss, and in order to sign it, you've got to sign it. I don't think you argue that. My question is, though, you're assuming that the people here who have prosecuted this have to come in and demonstrate that you have the authority. My suggestion to you is, you all have some obligation to, do you not, to offer to the district court the reasons why. In other words, you move to dismiss, and the court has, unless they just consent to it, why aren't you obligated to offer some reason for it, even under SWIN? Well, as a practical matter, we do offer reasons in all of these cases, including, as I mentioned before, in the DC Circuit, where that's the only circuit where the SWIFT standard clearly governs. We cited, again, the Snyder cert opposition. It's a case that the relators challenged the application of SWIFT, went to the Supreme Court, they denied cert. But the government gives reasons, even in those cases. They don't give reasons with the same extensiveness as we do in cases under Sequoia-Orange, where we have to satisfy a rational relation test. And here, knowing that this circuit has not yet opined on which standard to apply, the government gave ample reasons. And again, I want to emphasize a really important point. In addition to the resource- Ample reasons under either standard, you say? Yes, absolutely, Your Honor. And I want to emphasize- The coast or the West Coast? Yes, it would satisfy any of the courts. And that's a really important thing. And I do not want to stand in the way of an affirmance on the grounds that we satisfy the Sequoia-Orange standard. And, you know, we don't have to decide between these two standards. But there is a split. And what I'm suggesting is that this court's decisions point in favor of the SWIFT decision. But the rational basis says, do you have any obligation to support a motion to dismiss with justifications other than, it's our decision, this is not a good idea? Have we changed our mind? Given the history of the case, this is not something that- When the case first came in, obviously, you elected to let that go forward. And then you've been hand-in-hand with these litigants all along. And given this huge expenditure of effort. And then here at the last minute, this is their argument, you come up with this dismissal. And then that's the context in which we ask this question. Regardless of the standards and of that circumstance, is there no obligation to do anything other than say goodbye? Well, Your Honor, we did far more than say goodbye here. We explained- Well, you told me that we phoned them on the call, gave them a telephone call. No, Your Honor. We gave them much more than a telephone call. These litigants got extensive process. They got multiple meetings. They got a 10-week delay between the initial- Yes, you affected first on the basis that there were a number of other litigations, state litigations, and so forth. And they dismissed those. The government has moved to dismiss- In the course of that, they met all your requests, as I read the record. The government has moved to dismiss other cases filed by this corporate relator. And it is appropriate for the government to consider the source of the information in the relator. But I want to go to your point, Your Honor, about the timing. The relators seem to suggest that there's something nefarious about the timing here. Not nefarious. Relators attack- The question is due process fairness, because the argument is that they, when you have allowed these litigants to go this far to participate, unless there's a statutory command, they obviously have a great deal invested in it, a property right, in a sense, that can be terminated, but certainly not on just a whim. Now, I'm not suggesting you did it on a whim or you didn't. I'm suggesting that the question I have put to you is, what is your obligation, if any? I hear you saying you don't have any obligation. I want to be clear that that would be the SWIFT standard, that we don't have an obligation, but as a matter of practice, we do even under SWIFT. We have to choose between SWIFT and the other. I understand. And the point that I would like to make is that every relator thinks that they have a great claim. The government is uniquely positioned to decide whether the claim is going to be problematic. The government is not confined to the four corners of the complaint in the same way that a district court is in ruling on a motion to dismiss. The government conducted an extensive investigation here. I'm sorry, but are you saying to me that one of the bases of the objection was the strength of the claim, the merits of the claim? Absolutely, your honor. I mean, the very first page of our motion to dismiss says we've determined that the claim doesn't have merit. But I want to be clear that even under Sequoyah Orange, the Sequoyah Orange, the Ninth Circuit has validated the approach that says you can dismiss even meritorious claims. They were very clear in that very case. They assumed the claims had merit. Nevertheless, dismissal was appropriate under the standard they conjured up out of whole cloth there. The standard does not come anywhere from the statute. The Sequoyah Orange decision makes clear it was affirming a rational relation test that the district court simply made up. There is no standard of review in CCDF. I'm suggesting to you the word hearing has content, and that is in the statute, isn't it? That's correct, your honor. And we think that the word hearing... What does hearing mean then? Well, we think that the word hearing is giving context or giving content in a variety of ways. One way is, as the D.C. Circuit said, it gives the relator a formal opportunity to try to persuade the government not to dismiss the case. It also gives the government an opportunity to put the basis for dismissal on the public record. That's a valuable thing. Rather than just a case being shoveled away in the dark of the night, there's a public place where the government has articulated why it's going to dismiss. And as we've discussed, it also gives the relator an opportunity to raise plausible allegations of fraud on the court or some sort of other unlawful motive. They didn't do that here, and the district court expressly found those sorts of things were not present in this case. Was that a public hearing in this case? Yes, your honor. It was not sealed in any way. I'm sorry? It's a public transcript available to the public. I believe so. I didn't see any markings that suggested it was sealed. It was a hearing before the magistrate judge. It runs about 80 pages long. What I think I would object to is Mr. Starr's belated characterization of the hearing requirement as meaning essentially a mini trial on the merits. The government shouldn't have to litigate the merits of a False Claims Act case against the government is normally on the same side of the V as a relator. We litigate anti-kickback cases. They are very important cases in our in our arsenal. We want to make sure that when we take an anti-kickback case, we can win the anti-kickback case so we don't make bad law on appeal. Much of my practice involves cleaning up weak key tam actions that have gone to the Court of Appeals, filing amicus briefs that encourage this court and others not to rule broadly in ways that could hurt the government's enforcement interest. So we're the ones who are the repeat player, who have the long view of whether these claims should go forward or not. And the Supreme Court and this court in Riley and other cases has recognized that we're uniquely positioned to make those sorts of prosecutorial judgment. If right now Eli Lilly was and I have no idea if they are, but we'll just say that that they were making a valid vaccine for COVID. And you therefore didn't want to sue them because you want the COVID vaccine. So nothing to do with the actual merits of the case, but the fear of making them step back from the COVID vaccine. Would that be a legitimate basis to dismiss the case? Absolutely, Your Honor. And we raised policy concerns similar to that, you know, about the fact that, you know, the claims here are predicated on the provision of what they call illegal remuneration under the anti-kickback statute. And it takes the form of support services and other patient information services provided to patients. And that is the sort of thing that the government actually wants to encourage. The anti-kickback statute does prohibit some forms of remuneration that's designed to induce fraudulent claims to Medicare and other government payors. However, we have a very strong policy interest in ensuring that people get the information they need to use the drugs that the government is paying millions and millions of dollars for. Counsel, I have three quick questions. Has the government proceeded with NHCA in any case, or has it dismissed every case that they've tried to bring? It is dismissed, I believe, the large majority. And most of them have been, you know, disposed of the same way as this court did or the district court did. Is that because the government doesn't want to work with the NHCA because it doesn't like these corporate people bringing in the data crunching to do this work? No, Your Honor. And again, the fact that we've allowed some cases, this is spelled out in our brief, the fact that we have allowed some cases to proceed, you know, belies any claim of animus against the corporate relator. However, it is perfectly appropriate for the government to consider the source. The False Claims Act has all kinds of provisions that can, you know, suggest that the government should consider whether the valuable information is being brought forward by the relator. Is that the answer is no, you haven't dismissed all of their cases, but you could if you wanted to. That's correct, but I want to be very clear. I've got two more questions then. Okay. Did you violate the government's practices, rules? Opposing counsel said you did in two ways regarding a memorandum and a DOJ policy. Is that correct that that was violated in reaching this decision? No, it's not correct. And it's not something that's in the record. The Gramston memo that he's referring to is something that is labeled privileged and confidential, but is widely now disseminated among defense counsel and relators. All that does is essentially codify the types of things that the government normally considers in, you know, moving to dismiss. And the objective in the Gramston memo, like any internal government guidance, is to provide uniform treatment, to basically ensure that people are considering the same things, you know, around the country when they're thinking about moving to dismiss. It's just a list of non-binding factors. There's no violation of that. That's an argument that, again, just has sort of appeared, you know, at this oral argument. Okay, well, that was in the brief. I circled it yesterday when I was reading the briefs to ask you this. And then the other point was the other, they say you also violated DOJ policies. In addition to the memo, there's two areas in which they say you violated. Do you have any comment on that? No, there is no violation of DOJ policies. Again, we've gone through and explained what we consider, we've offered a conservation of resources rationale and a public interest rationale here. Those are, you know, eminently sufficient under the Sequoia Orange standard. We think the court, again, should adopt the SWIFT standard, but we think the court could easily affirm under the rational relations standard here. Okay, well, we haven't really, and I'm going to have to give you each one more minute or something. Can you quickly tell us why this isn't arbitrary and capricious? So you can each have one more minute, because the same kind of problem we had with the other, we need to know why it is and why it isn't arbitrary and capricious. Sure, well, I'll try to do that again. But the government articulated rational reasons for moving to dismiss, including a concern that the massive scope of this case, which involved 11 key TAM actions, 38 defendants, and just, you know, claims over a six-year period and, you know, tens of millions of Medicare claims, was going to embroil the government in litigation that it did not think had merit and that it was not worth it. And it detailed the number of attorney hours that it spent on the case so far investigating it. It hypothesized, you know, the discovery obligations that the government would be, and costs that government would be forced to incur. And then it also offered a policy rationale that basically I alluded to before, that the provision of these sorts of support services is in this particular case, based on the government's investigation of these claims, not illegal remuneration under the anti-kickback statute. It's a complicated area, but the government makes policy choices about whether to proceed with weak cases or strong cases and when to pull the plug on cases. That's a quintessential exercise of executive branch discretion. Was there an analysis made of benefits? You said the costs were analyzed. Were benefits analyzed? Well, again, we don't think even Sequoia Orange contemplates, and I think it's quite clear, a strict cost-benefit analysis. As we pointed out in our brief, it's sometimes difficult to monetize what the benefits are. If you think the claims have no merit and they're not going to succeed, and you also think that you're expending too much time already investigating the case, you shouldn't be forced to engage in some sort of economic analysis that really requires you to spend more time. The government, again- So is the answer there is no benefit analysis because one wasn't necessary? Is that the answer? The answer is that there was not a cost-benefit analysis in sort of something that an economist would think about. There was a cost-benefit analysis in the sense that the government determined that the claims had no merit and that the burdens were going to be significant here. And therefore, the government wanted to dismiss the case. Okay. I'm sorry. I understand the policy provisions and as you articulated them and the justifications you put forward. Accepting all those, my question is one of the timing of it. Much of what you describe about this litigation is size, is demand, and resources were quite evident long before you intervene. And then you intervene precipitately. And along the way, there were not cautions that someone intervened but that's my question. The timing of it. I'll say it another way. Granted, you have this monitoring obligation and then this and indeed an obligation to manage the affairs. But the question is, doesn't that not include some kind of a timing component? Why has this come so late? Well, it's interesting that you view this as coming late, Your Honor. The timing, relators criticize us on both sides of this. Relators criticize us on both sides of this issue. Relators, we have cases in which the relators, we moved to dismiss it in an early stage and the relators said, well, you never gave me an opportunity to develop my case. Here, we gave them an opportunity to develop their case. They filed their claim in June of 2017. We let the district court rule on a motion to dismiss and they were allowed to file a second amended complaint. At that point, it became clear that the scope of the claims, the government had been monitoring. It became clear that the case wasn't going away, at least initially on a motion to dismiss and the government acted and that's responsible government behavior. It was clear there was going to be another substantial round of litigation on a case the government had determined lacked merit. If the government doesn't feel like it has been defrauded. I understand that. I have one more question for you. There is one long standing kind of roughly parallel situation which we have the government has absolute constitutionally controlled discretion to indict or not to indict but once that indictment is filed in the United States District Court, then you cannot under the rules, statutory rules, you cannot dismiss without leave of court and we've had litigation about the content of that's demanded by that grant of leave of court. And the decision of our court, the United States versus Cowen, the court said that you had to have some basis for the SNR ticket to be a rational basis. That comes to my mind because we know that there's an unfettered complete discretion of the government to proceed or not proceed with criminal investigations. But once it is then filed and the rule says leave of court, the question is what is the content of that leave of court? Here we have a statute that says a hearing and my question is what is the content of that hearing? And once we get that framework in mind, I get to your arguments you're articulating very well. So I believe your honor is referring to criminal rule 48 and the court in Riley actually addresses this and it's true, you're right, that the government does have wide latitude under rule 48 to dismiss even an indictment that has been filed. And I would refer the court in Riley to the discussion 252 F third, 756 and 757 where the court actually contrasted the authority the government had under the key TAN provisions to dismiss with the rule 48 discretion. It actually said that the authority is not constrained in the key TAN context by the rule 48 requirement to get leave of court. The court says, although our judicial system allows for the seemingly greater intrusions by the judiciary into the executive's paramount power to prosecute in the criminal context, it doesn't take a similar approach to the key TAN context. So I agree with your honor that there is a strong analogy there. I think the government has great discretion in that context as well. However, again, I think the court has recognized the government has even broader potential authority to dismiss in this context. I see that my time is up. I'm happy to address any further questions for as long as the court likes. Thank you, your honor. Judge Elrod, I'm mute. You're muted, Judge Elrod. Thank you. Judge Haynes had a hypothetical about COVID. That is indeed a hypothetical. This case has nothing to do with COVID, does it? No, your honor. I mean, the dismissal decision was long before COVID, but I think it is- That's my last question. Well, I think it's a good illustrative example of the type of policy concern the government might be able to consider here that wouldn't leap out on the face of the papers, that has nothing to do with money. Thank you. Thank you, your honor. I'm going to stay away from the virus. I just was clarifying that that is not involved in this case. I wasn't criticizing the question in any way, shape, or form. I just want to make sure that the record's clear that that's hypothetical. Thank you. Mr. Starr, you may proceed with your rebuttal. Thank you. Let me turn first to Judge Haynes' questions, and I have three record citations. The record citation I was referring to is ROA 3082. If I may describe this, a quote from it. One example, there's sudden hate relationship for John Menino and NHCA. He's prepared to answer any questions that the court might have, and the court has the benefit of his declaration. Which really is not contested by the government. The second citation is at page 3081. Excising, but is in fact an authentic and meaningful hearing with law to apply. That was our request. And at page 3088, that we want a hearing and a meaningful hearing. And that under the law means an evidentiary hearing. There's 50 years of law with respect to what a hearing is. So we understood that the magistrate judge understood fully that we were seeking, certainly before she determined that our case failed, that we would be heard. I have to take issue with all respect with the government, point two. It says the Granston memo and the justice department memo were not violated, they were. He says the Cranston memo is a confidential document that's in the hands of defense lawyers. I think that borders on misleading the court. The Granston memo has been the subject of congressional hearings and sharp criticism by the chairman of the Senate Finance Committee, Charles Grassley. I'm not getting into a political squabble, but it comes with ill grace that the government would say there was no violation. The DOJ Justice Department manual precisely says just department attorneys should. And then there's the policy that we play. Isn't that the branch of government that needs to fix a problem with this? I mean, we're just judges. That's all we are. Congress can certainly pass a different statute and say you cannot, the US cannot move to dismiss absent X, Y, Z, or Q. So if they're dissatisfied with how the government and how the executive branch is progressing in this regard, they certainly have the ability to address that statutorily. We as judges, though, can't step in and say, we don't like the way this is going. And we're not asking you to have a policy disagreement. Judge, I don't think I've made my argument clear. The article three branch is to sit in its traditional adjudicatory forum. It is not to, but you've been urged to follow SWIFT, which is unfettered discretion, which is gaining some popularity. But for the most part, the district courts are in fact practicing law consistent with Goldberg v. Kelly, Hamdi v. Rumsfeld, which is an evidentiary hearing. We should be able to get that. And we plead with the court, don't toss us out without the ability to contradict what you've been hearing. I still have a problem because even the sites you gave me, I don't have them right in front of me, do not suggest that you asked to do something you weren't allowed. Your argument of meaningful hearing in the blue brief was a hearing in which the judge would adjudicate on some certain standard the wrongs of the government, okay? But I didn't see to where you said, I'm offering a bill of exception here because you didn't let me put on so-and-so on the stand. That didn't happen. I'm also totally unaware of a law that says the word hearing requires evidence because I have had thousands of hearings in my life that did not involve evidence because I was a trial judge, as were others here. So there are plenty of hearings that don't involve evidence being presented beyond what may be in the file that where a witness gets up and that's still a hearing. So I'm not going to define hearing that way. My colleagues, it's up to them. In the context, a hearing can in fact have different meanings. What is happening here, your honors, is the deprivation of a property interest. You're taking away a property interest identified by Justice Scalia. That triggers the entire panoply of constitutional protections and the government doesn't respond to that. We have a constitutionally protected right to what? A meaningful hearing. And that, of course, depends upon the circumstances and the experience of the district court. Now, the government has spent a fair amount of time in its argument talking about this case does not have merit. Even if it did have merit, we could dismiss it. We don't disagree with the latter. What we are seeking and we're beseeching this court to give us our day in court to show that the government's analysis of the merits is mistaken. And you have these powerful indications that the government is simply wrong. The magistrate judges report and recommendations. 12B6, we pass the plausibility. It's not the final adjudication, but it also has, and this is outside the record, but it is a matter of public record. The Texas Attorney General's office, other states are considering this, has in fact come alongside. And there is a state court, it's not binding on anyone. It's an indication seeking Medicaid recovery for what? These very claims. And I want to guide the court back to our reply brief, where we say that the policy concerns, we didn't hear the middle specificity today, but the specific policy concerns that have been articulated by the government are not our allegations. We are not challenging information to patients. That's their entire thrust. And we've been explaining it to them for months. You're not understanding our case. The magistrate judge did, because these very arguments that you heard very ably made today were advanced by a courtroom full of defense lawyers. They said, look, we've got OIG guidance. I see my time has expired. Thank you, counsel. We appreciate the arguments today. This case is submitted. Thank you very much, both of you. Thank you. Thank you.